UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 10-20196-CR-KING/BANDSTRA

UNITED STATES OF AMERICA,

vs.

YIMMI BELLAIZAC-HURDADO,
PEDRO FELIPE ANGULO-RODALLEGA,
ALBERIRO GONZALEZ-VALOIS,
and LUIS CARLOS RIASCOS-HURTADO,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on (a) [Defendant Pedro Felipe Angulo-Rodallega's] Motion to Suppress Statement (D.E. 55) filed on January 7, 2011; (b) [Defendant Luis Carlos Riascos-Hurtado's] Motion to Suppress Involuntary Statements (D.E. 62) filed on January 17, 2011; and (c) [Defendant Alberiro Gonzalez-Valois'] Motion to Suppress [Statement] (D.E. 73) filed on January 19, 2011. On January 20, 2011, these motions were referred to the undersigned for appropriate judicial proceeding by the Honorable James Lawrence King pursuant to 28 U.S.C. §636(b). Accordingly, the undersigned conducted an evidentiary hearing on these motions on February 2, 2011. Based on the facts as found herein and applicable law, the undersigned RECOMMENDS that these Motions to Suppress be DENIED.

## **FINDINGS OF FACT[1]**

On March 1, 2010, Lieutenant Felix Bermudez, a Panamanian border patrol officer was on duty at his base located just inland from the Pacific ocean shoreline near Playa Muerto, Panama. Just before midnight, Lt. Bermudez and other officers on the base heard an airplane circling overhead and then saw two boats approaching the beach. The lead boat appeared to be a fishing vessel being operated without lights which was being followed by a Panamanian marine vessel which was attempting to intercept the fishing vessel. Shortly before reaching the beach, both vessels turned north and proceeded a short distance to the mouth of a small river about one half kilometer away. Both vessels then stopped and engaged in gunfire with each other. Despite the dark hour, Lt. Bermudez and his men could still see flashes from the firearms and hear gun shots being fired by persons aboard the vessels.

Lt. Bermudez quickly responded by sending patrol units to the location. Sometime later, the search units returned and reported that they were unable to locate any of the persons aboard the fishing vessel because they had apparently abandoned the boat during the gunfire. The next morning, Lt. Bermudez organized a search party in a second

---

[1] These factual findings are based on the testimony of Lieutenant Felix Bermudez, a Panamanian border patrol officer working for the Panamanian National Frontier Service near Playa Muerto, Panama. No other witnesses were called by the government or any defendant at the suppression hearing.

attempt to locate persons previously aboard the fishing vessel.[2] Once again, no one was located.

Shortly thereafter, an "indigenous" person from the nearby village of Playa Muerto spoke to the Panamanian officers and reported that three unknown persons had come into his village looking for food and a way to get out of the area. Lt. Bermudez and his men then searched in the reported area and found one person, later identified as Alberiro Gonzalez-Valois ("Gonzalez-Valois"), lying on the floor of an elevated house ("tambo").[3] The border patrol officers ordered Gonzalez-Valois to come down after which he was told to kneel on the ground and place his hands on top of his head so that he could be searched and handcuffed. Gonzalez-Valois was wearing only short pants with no shirt or any footwear. Gonzalez-Valois appeared healthy despite a limp, and he was unarmed and without any identification documents. Gonzalez-Valois was then taken into custody, blindfolded to prevent him from observing the officers' weapons, and escorted back to the base. Once there, Lt. Bermudez sat with Gonzalez-Valois and asked him "routine" questions concerning his age, nationality, country of origin, purpose for being in Panama, method of entry, and intended destination. Gonzalez-Valois was not advised of any "right" to remain silent before being questioned by the officer. Gonzalez-Valois cooperated with Lt. Bermudez and gave his name while explaining that he had paid for travel to Panama aboard the fishing vessel which he abandoned once gunfire was exchanged with the other

---

[2]At some point, the fishing vessel was searched and found to contain approximately 960 kilograms of cocaine. This evidence was not the subject of the suppression hearing but is expected to be introduced by the government at trial.

[3]Lt. Bermudez explained that a "tambo" is a structure built on high columns in the heavily wooded area that consists of a floor and ceiling but no walls.

vessel. Lt. Bermudez questioned Gonzalez-Valois using standard border patrol questions for about 10-15 minutes. Gonzalez-Valois was not "interrogated" by Lt. Bermudez and was not questioned about the narcotics or anything else involving the vessel. Gonzalez-Valois was never threatened by Lt. Bermudez or any other officers at the base prior to making his statements. Nor was Gonzalez-Valois beaten, kicked, or otherwise mistreated by the officers. Lt. Bermudez completed his brief interview without incident and then turned Gonzalez-Valois over to other officers who arrived shortly thereafter in a police helicopter.

The following day, a local fisherman reported seeing two unknown males walking along the shoreline a short distance from the base. Lt. Bermudez sent out another search party by boat which returned about two hours later with two men in custody who were later identified as Pedro Felipe Angulo-Rodallega ("Angulo-Rodallega") and Yimmi Bellaizac Hurdado ("Bellaizac-Hurdado"). These men were also shirtless and shoeless and wearing only short pants. At the base, both men were handcuffed and blindfolded for safety reasons and to prevent their observation of weapons on the base. Lt. Bermudez then questioned both defendants separately using the same "routine" questions asked of Gonzalez-Valois the day before. Angulo-Rodallega readily responded by stating his name, country of origin (Colombia), and his method of travel (the fishing vessel). Angulo-Rodallega also stated that he had abandoned the vessel when gunfire erupted with the marine vessel. Bellaizac-Hurdado was interviewed shortly thereafter but he was reluctant to provide much information. Bellaizac-Hurdado was willing to state his name, date of birth and national origin, he did not admit that he had been on the fishing vessel. Neither Angulo-Rodallega or Bellizac-Hurdado was ever beaten, kicked, threatened with violence, or otherwise coerced into making any statements to Lt. Bermudez. Both defendants were

offered food and water after their brief (10-15 minute) interviews. Both defendants were then taken to another location by other police officers.

Shortly thereafter, a nearby villager came to the base and reported yet another stranger was in the village. Police search units responded and found a dark-skinned man, later identified as Riascos-Hurtado outside a village home. Riascos-Hurtado was taken into custody, handcuffed, blindfolded and escorted to the base. Riascos-Hurtado was questioned in the same manner as his co-defendants and he, too, admitted to arriving from Colombia aboard the fishing vessel on which he was the mechanic. Lt. Bermudez questioned Riascos-Hurtado for about ten minutes during which Riascos-Hurtado cooperated by answering the officer's routine questions. Riascos-Hurtado was not advised of any "right" to remain silent prior to questioning. This defendant was not beaten, kicked, subjected to any force or violence, or otherwise mistreated during his brief interview. Riascos-Hurtado, like his co-defendants, was then taken into custody by other Panamanian officers.

## ANALYSIS

Defendants Angulo-Rodallega, Riascos-Hurtado and Gonzalez-Valois (collectively the "moving defendants") seek to suppress their post-arrest statements to Lt. Bermudez, including any statements that they had traveled aboard the fishing vessel on which narcotics were allegedly found, on the ground that their statements were not voluntarily made due to coercive procedures used by the Panamanian officers. *Citing Miranda v. Arizona*[4] and other authority, the moving defendants argue that they were "in custody" at

---

[4] 384 U.S. 436 (1966).

5

the time of their "interrogations" and that the government has failed to establish that the Panamanian law enforcement officials did not "overbear" their will in order to get the incriminating statements. Defendant Angulo-Rodallega makes no specific allegations of mistreatment by the Panamanian officers but notes that his statements were made without the benefit of "substantial constitutional rights" he would have been entitled to, including his right to remain silent, had he been arrested in the United States. Defendant Riascos-Hurtado contends, without any factual support, that he was beaten and denied medical care, food and water, "hooded and verbally threatened" with "threats against his life" in order to elicit his statements. Defendant Gonzalez-Valois alleges that he too was coerced into talking by being taken into custody by "at least a dozen" Panamanian officers who beat him, tied him up with ropes, blindfolded him, stepped on his head, and threatened him with firearms causing him to fear for his life. Thus, all three defendants move to suppress their statements as involuntarily obtained by coercion and in violation of their due process rights.

Reviewing the facts, as found above, and applicable law, the undersigned finds no due process or other constitutional violations of any "rights" under *Miranda* or any other authority. First, and most importantly, the facts concerning defendants arrest in Panama and questioning by Lt. Bermudez provides no basis to conclude that any moving defendant was ever beaten, threatened, mistreated or otherwise physically abused by the Panamanian officials thereby coercing their post-arrest statements. Lt. Bermudez testified candidly, credibly, and in detail concerning the apprehension of all four defendants in this case, the necessary precautions taken by the arresting officers to search and restrain defendants, including the need to handcuff and blindfold them, and the procedures used to ask routine questions of each defendants as he would do of any persons entering

6

Panama.

The government correctly notes that defendants, arrested in Panama, were not entitled to protections under the United States Constitution including *Miranda* warnings, as suggested by the moving defendants in this case. *See United States v. Frank*, 599 F. 3d 1221, 1228 (11th Cir. 2010) ("Generally, 'statements obtained by foreign officers conducting interrogations in their own nations have been held admissible despite a failure to give *Miranda* warnings to the accused") (citations ommitted). The government notes two exceptions to this general rule: "(1) if the foreign officers' conduct 'shocks the conscience of the American court' and (2) if 'American officials participated in the foreign... interrogation or if the foreign authorities were acting as agents for their American counterparts', also known as the joint venture doctrine." *Id. at 1228-29.*

Here, no moving defendant has come forward with any evidence of mistreatment by the arresting officers despite strong allegations of both physical and mental coercion in their motions. Rather, the evidence produced by the government through the Panamanian officer who questioned all defendants and who had knowledge of the other officers involved in defendants' arrests shows that each defendant was arrested using only necessary and proper procedures, questioned only briefly by Lt. Bermudez, and never subjected to any force, violence, threats or intimidation by any officers prior to their candid admissions regarding their identification and method of travel from Colombia to Panama. Certainly, no evidence presented at the hearing "shocks the conscience of the court " or suggests any American law enforcement participation in this questioning which might suggest a different result.

In short, defendants' motions are without factual or legal support and each motion

7

should be DENIED.

## SUMMARY

For all of the foregoing reasons, the undersigned recommends: that (a) [Defendant Pedro Felipe Angulo-Rodallega's] Motion to Suppress Statement (D.E. 55) be DENIED; (b) [Defendant Luis Carlos Riascos-Hurtado's] Motion to Suppress Involuntary Statements (D.E. 62) be DENIED; and (c) that [Defendant Alberiro Gonzalez-Valois' Motion to Suppress Statement] (D.E. 73) be DENIED.

The parties may serve and file written objections to this Report and Recommendation with the Honorable James Lawrence King, United States District Court Judge, within ten (10) days of receipt. See 28 U.S.C. § 636(b)(1)(c); *United States v. Warren*, 687 F.2d 347, 348 (11th Cir. 1982), cert. Denied, 460 U.S. 1087 (1983); and *Hardin v. Wainwright*, 678 F.2d 589, 592 (5th Cir. Unit B. 1982); see also *Thomas v. Arn*, 474 U.S. 140, 153 (1985).

RESPECTFULLY SUBMITTED in Miami, Florida this 9th day of February, 2011.

TED E. BANDSTRA
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Honorable James Lawrence King
All counsel of record